**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

DUANE STARKS, JEVON KEARSE,
LAVERANUES COLES, LITO SHEPPARD,         CASE NO. 17-cv-62366-JIC
and All Others Similarly Situated,

                                                            JURY DEMANDED
      Plaintiffs,                        (Over $75,000.00)

      v.

GARY J. STERN, CHUHAK & TECSON, P.C.,
 a Professional Corporation, DAVID SHINER,
and JEANNE KERKSTRA,

Defendants.
_____/

## SECOND AMENDED COMPLAINT

      Plaintiffs, DUANE STARKS, JEVON KEARSE, LAVERANUES COLES, LITO

SHEPPARD (collectively referred to as the "Plaintiffs"), file this Second Amended Complaint

against Defendants, GARY J. STERN, CHUHAK & TECSON, P.C., DAVID SHINER, ans

JEANNE KERKSTRA (collectively referred to as the "Defendants"), and allege as follows:

### INTRODUCTION

      1.     Rumpelstiltskin could spin straw into gold.  Defendants, along with others

discussed below, thought they could do the same for garbage, spinning it into tax credits.  The

Commissioner of the Internal Revenue Service, the United States Tax Court, and the United States

Tax Court all uniformly disagreed, but unfortunately not before Defendants and others swindled

Plaintiffs out of millions of dollars.  See *Green Gas Delaware Statutory Trust v. Commissioner*,

903 F.3d 138 (D.C. Cir. August 14, 2018).

2.     The scheme at the center of this Second Amended Complaint for relief involved sale of bogus tax credits alleged to have been generated from non-conventional fuel sources in compliance with Section 29/45K of the Internal Revenue Code (known as FNS tax credits). Gary Stern ("Stern"), a former equity principal at Defendant Chuhak & Tecson, P.C. ("Chuhak"), has pled guilty to tax crimes and admitted that he deprived the government and the Plaintiffs out of millions of dollars.  (Ex. 1, Stern Plea Agreement).   Stern was sentenced to 18 months in prison on September 13, 2017.  (Ex. 2, 9/13/17 Transcript from Stern Sentencing Hearing).  Stern further admitted that the other Defendants and Chuhak management were active and knowing participants in this fraudulent scheme.  (Ex. 3, Stern Position Paper, pg. 9).  On July 14, 2016, the United States Tax Court also found that the tax credits purchased by the Plaintiffs and others were illegitimate, save for the very few legitimate credits that were used to conceal the true nature of the scheme in *Green Gas Del. Statutory Trust v. Commissioner* 147 T.C. No. 1 (2016) (available at www.ustaxcourt.gov/UstcInOp/OpinionViewer.aspx?ID=10860). That determination was upheld in its entirety by the United States Court of Appeals for the District of Columbia Circuit on August 14, 2018. See *Green Gas Delaware Statutory Trust v. Commissioner*, 903 F.3d 138 (D.C. Cir. August 14, 2018).  All deadlines for further review have passed.  See Doc. 107, at pg. 4.

3.     The scheme began by the Defendants and others approaching wealthy individuals and entities with a simple proposition: the sale of a certain amount of Federal Income Tax credits for a certain smaller amount of money. The Defendants and others represented that FNS credits were legitimate and that Plaintiffs and others could substantially decrease their tax liability by purchasing the FNS tax credits. In concert with the persons identified later in this First Amended Complaint as the "Landfill Operators," the Defendants perpetrated the multi-year scheme of selling the bogus FNS credits to unsuspecting individuals and entities, including Plaintiffs, for tens of

millions of dollars. Defendants and the Landfill Operators accomplished this by funneling the credits through a web of partnerships and limited liability companies controlled by them exclusively with the intention of concealing the tax credits' illegitimacy. All of the entities listed in this First Amended Complaint were created for the sole purpose of effectuating the scheme and had no legitimate business purpose.

4.      At all relevant times, Defendants and the Landfill Operators knew that over 95% of the tax credits they were selling were not legitimate.  (Ex. 5, November 2, 2006 Memorandum from David Shiner ("Shiner") to Stern)[1]. Despite this, Stern, with the assistance of other attorneys at Chuhak and in concert with the Landfill Operators, sold the bogus FNS credits to unsuspecting individuals and entities, including Plaintiffs, for tens of millions of dollars.  Subsequent to the sale of the knowingly illegitimate FNS credits, Defendants and the Landfill Operators created bogus tax returns and schedule K-1 statements in an attempt to conceal the illegitimacy of the tax credits from both the purchasers of such credits and the Internal Revenue Service and transmitted same both through the mail and electronically in furtherance of the scheme to sell, and get away with selling, bogus tax credits.

5.      After the Internal Revenue Service began to investigate the tax returns of individuals and entities to whom Defendants and the Landfill Operators sold credits, Defendants and the Landfill Operators submitted false statements and documents to the IRS in the hope that they could somehow fool the tax authorities into thinking that the credits were legitimate.  The Defendants and the Landfill Operators substantially lacked any proof, documentation, or other evidence that could have substantiated the validity of most, much less all of the tax credits and the deductions were ultimately disallowed, adding to the Plaintiffs' damages.  The July 14, 2016

---

[1] Ex 4 intentionally omitted.

United States Tax Court ruling and the August 14, 2018 D.C. Circuit decision set forth the numerous reasons that the tax credits were bogus.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this matter under 28 U.S.C § 1332 because the amount in controversy exceeds $75,000.00 and the Plaintiffs and Defendants are citizens of different states.

7.      This Court has jurisdiction over the Defendants because they purposefully availed themselves of Florida by conducting business in Florida, committing tortious conduct in Florida by harming multiple Florida residents including Plaintiffs herein.

8.      Venue is proper as the overwhelming majority of transactions giving rise to Plaintiffs' harm and injury occurred and were executed in the Southern District of Florida.

9.      The individual Plaintiffs are residents of Florida and Plaintiffs, Duane Starks and Jevon Kearse, currently reside in the Southern District of Florida.

10.     Defendant Chuhak is a law firm that engages in the practice of law nationally and maintains offices in Chicago, New York and New Jersey.  Chuhak solicits clients nationally including the Southern District of Florida.

## FACTS COMMON TO ALL COUNTS
## SECTION I – THE PARTIES AND PARTICIPANTS IN THE SCHEME

11.     This case stems from the concerted conduct of the Defendants and the Landfill Operators to induce individuals, partnerships, and corporations such as Plaintiffs into acquiring fraudulent tax credits that were represented by Defendants and the Landfill Operators to be in compliance with Internal Revenue Code Section 29/45K. The tax scheme to defraud the Plaintiffs and others was conducted through a pattern of racketeering activity (mail and wire fraud) and was accomplished through the efforts of a RICO enterprise.

A.    Parties

12.    Plaintiff Duane Starks is an individual who resides in the Southern District of Florida and is a citizen of Florida.

13.    Plaintiff Jevon Kearse is an individual who resides in the Southern District of Florida and is a citizen of Florida.

14.    Plaintiff Laveranues Coles is an individual who resides in Florida and is a citizen of Florida.

15.    Plaintiff Lito Sheppard is an individual who resides in Florida and is a citizen of Florida.

16.    Defendant Chuhak is a law firm located at 30 South Wacker, Suite 2600 in Chicago, Illinois that has its principal offices in Cook County, Illinois.

17.    Defendant Stern was, and Defendants Shiner and Kerkstra are, admitted to the Bar in the State of Illinois[2], and at the times and places relevant herein, were principals of Chuhak, acting as duly authorized agents and representatives of Chuhak, and acting within the scope of their employment.

B.    Participants

18.    Michael Horrell ("Horrell"), Richard Nichols ("Nichols"), Leon A. Greenblatt, III ("Greenblatt"), Andrew Jahelka ("Jahelka"), Kevin Werner ("Werner"), Elizabeth Sharp ("Sharp"), Michael May ("May"), John Connelly ("Connelly") (collectively the "Landfill Operators"), through the entities that comprised the "Green Gas Arrangement," marketed to the

---

[2] Defendant Stern was disbarred on consent on May 18, 2017 in connection with pleading guilty in federal court to aiding and assisting in the preparation and presentation to the Internal Revenue Service of false income tax returns.  See www.iardc.org/1detail.asp?id=361803456.

public through various means including through their attorneys at Chuhak the sale of tax credits as a way for individuals to reduce their income tax liability.

19.     Chuhak, through its agents, Stern, Shiner, and Jeanne Kerkstra ("Kerkstra"), held themselves out to have knowledge and expertise in the field of tax law and assisted the Landfill Operators in the sale and promotion of the tax credits to the public.  The Defendants engaged in the marketing and sale of bogus FNS credits through their own professional networks, including accountants and lawyers throughout the country.

20.     The Defendants and the Landfill Operators devised a scheme to sell abusive and illegal tax credits under the auspices of Section 29 and Section 45K through the entities identified as part of the "Green Gas Arrangement."

21.     At all relevant times, Rumpelstiltskin Inc. was owned by Greenblatt, Nichols and Jahelka and is a holding company for many of the entities used by the Landfill Operators to perpetrate fraudulent schemes.  Rumpelstiltskin was the parent of a wholly-owned subsidiary, Resource Technology Corporation ("RTC").  RTC entered into agreements with 24 landfills throughout the United States whereby RTC acquired rights to develop and construct gas-collection facilities at the landfills in order to produce and sell electricity from landfill gas in exchange for paying the landfill owners royalties measured as a percentage of electricity sales.  *Green Gas*, 903 F.3d at 140.

22.     At all relevant times, Scattered Corporation was a South Dakota corporation with its principal office in Chicago, Illinois and was owned and controlled by Jahelka, Greenblatt, and Nichols.

23.     At all relevant times, Banco PanAmericano Inc. was a South Dakota corporation owned and controlled by Greenblatt.

24.     At all relevant times, Giddyup, Inc., a corporation whose state of incorporation is currently unknown, was a company owned and controlled by Jahelka.

25.     At all relevant times, ROLJFLP, Inc., was a Delaware corporation owned and controlled by Nichols.

26.     At all relevant times, Archimedes Financial, LLC, was a Nevada limited liability owned and controlled by Horrell.

27.     At all relevant times, Methane Bio, LLC, RTC, and Delaware Gas and Electric, Inc. were used by the Landfill Operators and the Defendants to carry out the fraudulent scheme that is the subject of this Second Amended Complaint. The Defendants and the Landfill Operators knew that these arrangements likely would be heavily scrutinized by the Internal Revenue Service ("IRS"), be deemed abusive and not in compliance with the applicable section, and/or expose those participating in such arrangements to costly IRS audits, including substantial tax liabilities, penalties, and interest.

28.     Defendants and the Landfill Operators ran similar schemes in 2006 and 2007 as referenced in the July 14, 2016 United States Tax Court ruling and the August 14, 2018 D.C. Circuit decision.  The 2006 scheme (Merrillville) and the 2007 (also a Green Gas arrangement) are subject to separate lawsuits currently pending in Chicago, Illinois.  This lawsuit does not pertain to claims related to the Merrillville Trust or the 2007 Green Gas arrangement.

## SECTION II – FACTUAL ALLEGATIONS

**A.**     **IRS Scrutinizes Abusive Section 45K Claims and Stern Pleads Guilty to Tax Fraud**

29.     Internal Revenue Code Section 29, renumbered as I.R.C. Section 45K beginning January 1, 2006, permitted producers of certain qualified fuels from nonconventional sources, including biomass (such as methane gas produced from garbage landfills), to claim tax credits

known as FNS tax credits for the production of such fuels, if such fuels were sold to an unrelated third party.  Producers of fuel from nonconventional sources ("FNS") may be entitled to claim a federal income tax credit for the production and sale of the fuel. See I.R.C. § 45K (formerly I.R.C. § 29). The Internal Revenue Code strictly limits the manner, timing and availability of these credits ("FNS Credits").

30.     Under IRC Section 29, any FNS tax credits generated in years prior to 2006 which were unable to be claimed in the year they were generated could be carried forward and be used in future years only against the alternative minimum tax. Under IRC Section 45K, any FNS tax credits generated in 2006 or later years which were unable to be claimed in the year generated could be carried forward and used in future years as general business credits, meaning these were not limited to reducing just the alternative minimum tax.

31.     FNS credits have been heavily abused in the recent past. During this time unscrupulous attorneys, accountants, and tax return preparers have sold schemes falsely purporting to entitle the customers to millions of dollars of FNS credits. S*ee, e.g., United States v. George Calvert et al*., Case No 09-cv-00618 (M.D. Fla. Apr. 2, 2009); *United States v. Ronald Fontenot et al*., Case No. 09-cv-00893 (E.D. Tex. Apr. 2, 2010); *United States v. Sally Hand-Bostick et al.*, Case No. 09-cv-01075 (N.D. Tex. Aug. 2, 2010). To date, at least 18 individuals have been permanently enjoined from marketing or selling FNS credits, and at least 3 individuals have been convicted of crimes in connection with these credits. *See United States v. Anderson*, Case No. 09-cr-00177 (M.D. Fla. Apr. 15, 2009) (Robert Anderson convicted of conspiracy to defraud the United States and to commit mail fraud); *United States v. Calvert*, Case No. 10-cr-00325 (M.D. Fla. Aug. 4, 2010) (George Calvert convicted of conspiracy to commit wire fraud and money

laundering); *United States v. Guido*, Case No. 10-cr-00325 (M.D. Fla. Aug. 4, 2010) (Gregory Guido convicted of conspiracy to commit wire fraud and money laundering).

32.     In November 2013, the United States government filed a Complaint for Permanent Injunction and Other Relief against Defendant Gary Stern for actions at issue in this Complaint and for other criminal conduct that has been adjudicated separately. *See United States v. Gary J. Stern*, Case No. 13-cv-07844 (N.D. Ill. Nov. 1, 2013).  (Ex. 6, Stern Injunction).  To resolve that Complaint, Defendant Stern entered into a plea deal with the government, where, among other things, he agreed to be permanently enjoined from preparing, filing, or assisting others in preparing or filing federal taxes other than for himself or his family. (Ex. 6, Injunction). *United States v. Gary Stern*, Case No. 14-cr-00580 (N.D. Ill. Oct. 14, 2014)). On February 27, 2014, Defendant Stern, per the terms of his settlement with the Justice Department, sent Plaintiffs a copy of the Injunction to which he agreed.   The United States government filed an eight-count criminal indictment against Defendant Gary Stern in this District concerning another related scheme ("the Merrillville Trust") to sell bogus FNS tax credits. *See United States v. Gary Stern*, Case No. 14-cr-00580 (N.D. Ill. Oct. 14, 2014). (Ex. 7, Stern Indictment).

33.     On September 7, 2016, Stern pled guilty to tax fraud.  (Ex. 1).

34.     On September 13, 2017, Stern was sentenced to 18 months in prison.  (Ex. 2).

35.     Stern has admitted that other Defendants were actively involved in the scheme to defraud the Plaintiffs and the United States government.  (Ex. 3, pg. 8-10).

**B.     The Green Gas Arrangement**

36.     Until August 7, 2005, Section 29 of the Internal Revenue Code allowed a credit for the production and sale of fuel from non-conventional sources, including from landfill biomass (i.e. rotting trash). On August 8, 2005, Section 29 was reassigned as Section 45K and became

effective for tax years after 2005. The purpose of Section 29 was to subsidize the activity of converting landfill gas into electricity to reduce America's dependence on foreign fossil fuel.

37.     To qualify for FNS credits, a taxpayer must meet various requirements, including producing fuel and selling it to an unrelated person during the taxable year for which the credit is claimed. I.R.C. § 45K(a)(2) (formerly I.R.C. § 29(a)(2)).

38.     An owner of a qualified property or energy producing facility who is not able to take full advantage of the tax credit may, in some circumstances, sell an economic interest in the property or facility to someone who is able to take advantage of the tax credit.

39.     The amount of the FNS credits allowed in a given year is based on the amount of fuel the taxpayer produces and sells that year for which gas is converted into usable energy. The taxpayer is entitled to FNS credits in proportion to his or her ownership interest in the gross sales from the property or facility. I.R.C. § 45K(d)(3) (formerly I.R.C. § 29(d)(3)).

40.     The taxpayer must acquire economic benefits and burdens related to the property or facility, including the potential to receive additional economic benefit from the sale of fuel after the credit expires.

41.     RTC was a company located in Chicago purportedly specializing in landfill maintenance and natural gas extraction and has been bankrupt since 1999.

42.     The owners and board members of RTC have included the Landfill Operators: Greenblatt, Nichols, Jahelka, Connelly and Werner.

43.     Several individuals from RTC hired Defendant Stern to create a tax structure for funneling FNS credits to people who wanted tax benefits. The Defendants assisted and facilitated the Landfill Operators to implement and operate what became known as the Green Gas Arrangement, essentially an enterprise utilized to sell bogus FNS credits.

44.     During this time period, Defendant Kerkstra boasted that the Defendants had more experience with FNS credits than any other firm.

45.     Defendant Chuhak and the Landfill Operators, drafted the documents necessary to create the following tax shelter entities: Gas Delaware Business Trust, Green Gas Delaware Statutory Trust, Bradshaw Gas General Partnership, Ciao Gas General Partnership, Buon Giorno Gas General Partnership, 2004 Gas General Partnership, Methane Blue LLC, Methane Green, LLC, and Red Gas LLC; Pontiac Statutory Trust; Methane Bio LLC; Allen Gas GP; Bradshaw Gas GP; Perry Gas, GP, Jaguar Gas GP; Buon Giorno Gas GP; Craig GP; Australia Gas GP; Casper Gas GP; Jones Gas GP; Zoeller Gas GP; Irwin Gas GP; JMK Gas GP; 2006 Methane Gas GP; DJRJ Gas GP; 2005 Medinah Gas GP; Winged Foot Gas GP; Bloomington GP; Methane Green LLC; Baltic Gas GP; Methane Blue LLC; Colt Gas GP; China Gas GP; Rocca Gas GP; DK Gas GP; BV Gas GP; Villapiano Gas GP; Pink Gas LLC; Werdna Gas GP; Red Gas LLC; Delaware Gas & Electric, Inc.; LaMonica Gas G.P.; Orange Gas; Davis Gas GP; Ciao Gas GP; Arrivederci Gas GP; and San Bernardino Gas GP; (Collectively, "the Green Gas Arrangement").

46.     The Plaintiffs in this case purchased FNS credits from Green Gas Arrangement entities Bradshaw Gas and Ciao Gas.   The Green Gas Arrangement served as the vehicle by which the Defendants and the Landfill Operators conducted their illegal acts.

47.     The Green Gas Arrangement worked as follows: An individual seeking to reduce his or her federal income tax liabilities sent money to either the Defendants or the Landfill Operators in exchange for a percentage of FNS credits that would exceed the individual's buy-in cost. Thereafter, the Defendants allocated a certain dollar amount of FNS credits to that participant for use on that participant's federal income tax return. Generally, FNS credits reduce an

individual's tax liability on a dollar-for-dollar basis, meaning that $100 of FNS credits – purchased for less than $100 – would eliminate $100 in tax liability.

48.    The FNS credits that the Defendants allocated to participants originated with an entity called Green Gas Delaware Statutory Trust ("Green Gas Trust"). Green Gas Trust purportedly accumulated these FNS credits as a result of landfill gas sales agreements with RTC.[3]

49.    Green Gas Trust is a Delaware trust that has been controlled by Landfill Operators Connelly and Werner. The Defendants created and represented Green Gas Trust, and in addition, Defendant Stern personally prepared that entity's tax returns (or at least signed them).

50.    On the 2005 federal income tax returns for Green Gas Trust, Stern prepared tax returns that claimed FNS credits in the amounts of $5.40 million.

51.    In order to allocate FNS credits from Green Gas Trust to individual participants, the Defendants funneled the credits through a complex layering structure that utilized over 115 partnerships, companies, and other entities. On information and belief, this was done so as to obfuscate the true nature of the scheme and conceal it from the IRS and therefore attempt to prevent the IRS from determining the origin and validity of the FNS credits.

52.    The Defendants' control over the Green Gas Arrangement is demonstrated in a memo of Defendant Kerkstra to Defendant Stern. In the memo, Kerkstra references a spreadsheet given to her by Landfill Operator Nichols concerning the Green Gas Arrangement. She goes through a detailed analysis of how she (along with Defendant Stern and Shiner) simply re-adjust

---

[3] Green Gas was only able to establish agreements with RTC on 19 of the 24 landfills. Green Gas failed to establish such agreement with the other 5 landfills, which just so happened to be the only landfills where there was ever operational equipment capable of turning landfill gas into electricity. *Green Gas*, 903 F.3d at 141.

the tax credits, capital contributions and other fees to give the appearance of legitimacy. (Ex. 8, Memo from Kerkstra to Stern dated May 12, 2006).

53.     The May 12, 2006 memorandum also confirms that the amount of tax credits received by purchasers like Plaintiffs did not actually correlate to the amount of the contribution. The Defendants always provided an explanation as to why an individual or entity was not receiving the amount of credits originally contracted for.

54.     The Defendants prepared the tax returns that served as the conduit for funneling FNS credits from the Green Gas Trust to individual participants.

55.     In order to participate in the Green Gas Arrangement, participants signed various documents prepared by the Defendants, including purported conflict of interest waivers. These documents were not provided to the participants until after they tendered money to the Defendants or the Landfill Operators, as the case may be. Participants paid varying amounts in order to receive FNS credits, depending upon their income tax liability.

56.     These contributed funds were held and disbursed at Defendant Stern's or the Landfill Operators' direction.

57.     The Defendants used the 115 partnerships, companies, and other entities to funnel over $11 million in FNS credits from Green Gas Trust to hundreds of participants, including Plaintiffs, from 2005 through 2007.

58.     Besides Plaintiffs, these individuals included other professional athletes, wealthy professionals, and Defendant Stern's business associates.

59.     The Defendants prepared the federal income tax returns for the partnerships that were used to funnel these tax credits to participants.

60.     Defendant Stern personally signed many of these tax returns.

61.    The credits themselves purportedly were generated in connection with landfill gas that Defendants and the Landfill Operators claimed had been produced from at least 24 different landfills located throughout the United States.

62.    The FNS credits that were sold to participants in the Green Gas Arrangement were illegitimate for a number of reasons that were known exclusively to the Defendants and the Landfill Operators and purposely withheld from Plaintiffs and other purchasers.

63.    First, Green Gas Trust and RTC did not have any legal rights to the landfill gases claimed at some of the landfills. In fact, after RTC's rights to extract gas at certain of these landfills were terminated, RTC's employees were prohibited from entering the landfills. (Ex. 9, February 21, 2006 Email from Edmund Burke To Kerkstra).

64.    Second, the majority of the landfills that FNS credits were being claimed from did not have a gas collection system in place, while others did not have an operational gas-to-energy conversion facility.

65.    Third, many of the landfills did not have sufficient landfill gas to sell for energy-conversion (i.e. the gas was not of sufficient quality to be sold; in most instances the gas was, at most, flared).

66.    Between 2005 and 2006, the Defendants used the Green Gas Arrangement to funnel over $12.4 million in FNS credits. Approximately $11.2 million of these credits were disallowed by the IRS for the reasons identified above.

67.    For 2005, the IRS only allowed $450,360 out of the over $5.3 million the Green Gas Delaware Statutory Trust tried to claim on its tax return. The IRS allowed only $98,335 out of the over $4 million in FNS credits that the Defendants and the Landfill Operators allocated to participants in 2006 in connection with the Green Gas Arrangement.

68.     Backdating was prevalent throughout the Green Gas Arrangement. For example, Stern explicitly directed the other employees of Chuhak to backdate checks that were used to funnel money between the various entities he controlled. The Stern Indictment also notes the prevalence of backdating. (Ex. 7).

69.     Documents were routinely executed with backdating to whatever date was expedient for purposes of facilitating the scheme without regard to the true transaction date.

**C.      The Defendants' Role In The Green Gas Arrangement**

70.     The Defendants provided "legal services" for the Green Gas Arrangement, including rendering professional opinions on how to create the Green Gas Arrangement in compliance with Section 29/45K of the Tax Code. Chuhak knowingly assisted the Landfill Operators by fielding calls from potential purchasers and advising them about the purported legitimacy of the credits in order to induce them to purchase.  The Defendants never disclosed the fact that the credits were illegitimate because the credits were derived from unowned landfills, landfills without equipment to capture, convert and store the electricity and that the gas was not of sufficient quality to convert and sell.

71.     Defendant Stern controlled and operated most of the partnerships and other entities that he used to funnel FNS credits to participants in the Green Gas Arrangement. For example, Defendant Stern managed at least 48 partnerships and companies, personally represented at least 17 entities, was an officer of at least 12 entities, and was the sole shareholder of at least 10 entities.

72.     At Defendant Stern's direction, employees of Chuhak, including Defendant Kerkstra, drafted the participation documents that the individual participants signed in order to participate in the Green Gas Arrangement.

73.     Defendant Stern, along with the other Chuhak Defendants, purported to represent each of the hundreds of entities that were used to implement the Green Gas Arrangement. At Defendant Stern's request, participants, including Plaintiffs, executed forms that purported to waive any conflict involved in the transactions.

74.     Defendant Stern held and personally disbursed (or directed other Chuhak Defendants to disburse) some of the funds that participants contributed to the Green Gas Arrangement.

75.     The Defendants prepared over 170 federal income tax returns that they used to funnel FNS credits to participants in the Green Gas Arrangement.

76.     The Defendants sent correspondence and other documents to Plaintiffs and other participants, including Schedules K-1 and explanatory cover letters that identified the amount of false FNS credits that they had allocated to Plaintiffs and other participants for use in a particular tax year.

77.     Defendant Stern and the other Chuhak Defendants sent Plaintiffs various tax forms which purported to show that Plaintiffs were entitled to hundreds of thousands of tax credits for the year 2005. (Ex. 10, Correspondence b/t Chuhak and Plaintiffs).

78.     The Defendants and the Landfill Operators solicited and sold FNS tax credits to the public, including Plaintiffs. The "billing records" kept by Defendants reflect numerous hours spent by Defendants Stern and Kerkstra soliciting potential investors through phone calls and presentations.

79.     Defendant Stern was identified as a point of contact on many of the landfill gas sale agreements that purported to legitimize the manner in which the Defendants allocated FNS credits to Plaintiffs and other participants.

80.     All of the Defendants benefitted from the operation of the Green Gas Arrangement. The Landfill Operators were not just among the biggest clients of the Chuhak firm, they were important to the firm and to Stern personally.  By virtue of representing the Landfill Operators, an attorney's career would be blooming; s/he could attract significant additional clients to the firm, and s/he could thereby gain a measure of prominence and stature both within the firm and in the broader legal community.  Defendant Shiner admitted in his grand jury statement, that the Defendants perpetrated and concealed the fraud because they wanted to maintain their business relationship with the law firm's largest client – the Landfill Operators.

D.     **Marketing of the Green Gas Arrangement**

81.     The elaborate web of partnerships and companies gave the appearance to Plaintiffs and other participants that they could legitimately claim FNS credits on their individual income tax return.

82.     In reality, the Defendants were simply utilizing these entities as the means by which to sell bogus FNS credits to Plaintiffs and other participants for a stated amount, *i.e.* "to monetize tax credits provided under 26 U.S.C. § 45K."  *Green Gas*, 903 F. 3d at 141.

83.     The Defendants and the Landfill Operators marketed these tax credits as a tax benefit, not as an investment in a landfill or in a gas-to-energy conversion facility.

84.     Based on the purported legitimacy of the FNS credits, individuals, including Plaintiffs, purchased credits from the entities in the Green Gas Arrangement and unknowingly claimed the false FNS on their subsequent federal income tax returns.

85.     The Landfill Operators and Defendants used several sub promoters to sell the bogus FNS credits to Plaintiffs and other participants.

86.     At the Defendants' coaching, these sub promoters, in tendering introductory paperwork to a prospective participant including Plaintiffs, would simply state "[h]ere is the information for the purchase of the tax credits."

87.     In Plaintiffs' case, Landfill Operator Horrell brought on Karen Brenner as an unwitting sub promoter. In April of 2005, based on the fraudulent representations of Horrell and the Chuhak Defendants about the legitimacy of the Green Gas Arrangement, Karen Brenner promoted the tax credits to Plaintiffs' representative, Edward Rappaport. In May of 2005, Brenner introduced Rappaport to Defendants Stern and Kerkstra.

88.     The United States Tax Court found that the Defendants solicited and compensated promoters, including the Landfill Operators, to sell FNS credits to participants including Plaintiffs. (Ex. 4, pg. 43).

89.     The Defendants also used the entities controlled by Defendant Stern and the Landfill Operators to create the appearance that they actually had the right to sell the FNS credits. In reality, Chuhak had an informal netting arrangement with the Green Gas Arrangement through which it would earn the equivalent of a 50% commission on the investments of those participants it brought into the bogus schemes.

90.     Based on the misrepresentations of the Defendants and the Landfill Operators, Plaintiffs and the other participants decided to purchase the FNS tax credits being sold by all Defendants.

91.     The Plaintiffs are liable for back taxes, interest, penalties and professional fees as a result of the disallowed tax benefits they claimed from the Green Gas Arrangement.

E. <u>Co-Conspirators</u>

92.     Whenever in this Second Amended Complaint reference is made to any act, deed, or transaction of any business entity, the allegation means that the business entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control, or transaction of the business's affairs.

93.     The acts alleged in this Second Amended Complaint to have been done by Defendants were authorized, ordered and condoned by their parent business entities and authorized, ordered and performed by their officers, directors, agents, employees, or representatives while engaged in the management, direction, control or transaction of their business affairs.

94.     All Defendants were engaged in a conspiracy to defraud and each of them is liable for the actions of the other as if they themselves had committed the acts.

95.     The Defendants were acting as the agents of the others with either express or implied authority to so act in furtherance of their common goal to operate an enterprise and all Defendants benefited financially therefrom and ratified the acts of the others.

96.     Therefore, each of the Defendants is jointly and severally liable for the actions of every other Defendant and co-conspirators, Landfill Operators committed in furtherance of the conspiracy.

F. <u>Damages</u>

97.     As a consequence of Defendants' conduct and racketeering violations, Plaintiffs have sustained injury and damage to their business and property in the form of substantial expenses incurred for professional fees, disallowed credits resulting in substantial tax liability, substantial

expenses incurred in dealing with the Internal Revenue Service, incurred penalties and interest, and other damages in excess of $75,000.00.

### G.   Fraudulent Concealment and Equitable Tolling

98.    Plaintiffs had no knowledge of Defendants' unlawful scheme, could not have discovered Defendants' unlawful scheme and could not have discovered Defendants' unlawful conduct at an earlier date by the exercise of due diligence. As described above, Defendants affirmatively concealed their illegal acts and these acts only recently became known to the Plaintiffs through the civil and criminal investigations by the United States Internal Revenue Service. As a result of Plaintiffs' lack of knowledge of the effects of Defendants' unlawful scheme, Plaintiffs assert the tolling of any applicable statutes of limitation affecting the right of action by Plaintiffs.

99.    Upon each and every instance that Defendants failed to disclose their illegal conduct, Defendants knew or should have known that the undisclosed information was material to those consumers who reasonably believed Defendants' conduct to be lawful and not fraudulent. Plaintiffs relied on the acts and omissions of Defendants to their detriment. Defendants knew or should have known that Plaintiffs were relying upon Defendants during this time period. Defendants took gross advantage of the lack of knowledge of Plaintiffs.

100.    Plaintiffs were not injured until the 2016 United States Tax Court Opinion was upheld by the D.C. Circuit without further challenge as of November 13, 2018, when no further challenges could arise and the judgment was no longer appealable and thus became final.

101.    Defendants have committed numerous additional overt acts in furtherance of their conspiracy, both within and prior to four years from the date of the filing of this action. Such overt acts include the illegal actions regarding the fraudulent scheme described herein.

102.     As the federal government has recognized, Defendant Stern and the other Defendants concealed, misrepresented, and hid, and caused to be concealed, misrepresented, and hidden, the existence of the corrupt endeavor, the purpose of the corrupt endeavor, and the acts done in furtherance of the corrupt endeavor.

103.     The Defendants and the Landfill Operators controlled all aspects of the enterprise through the various entities and control over all documentation.

104.     Given Defendants' and the Landfill Operators' control over all aspects of the physical enterprise (including the landfills) and the corresponding documentation, Plaintiffs could not know of the fraudulent activity.

105.     Plaintiffs are not tax experts and in claiming the purported tax credits on their returns, relied on (i) Chuhak Defendants as their tax advisor, (ii) Methane Bio, LLC (the tax matters partner) and (iii) the Landfill Operators, as managing general partner(s) of the entities that formed the Green Gas Arrangement.

106.     The Defendants gave repeated oral and written assurances that the tax credits were legitimate, both before and after Plaintiffs purchased the bogus credits.

107.     Therefore, each instance in which Defendants engaged in the conduct complained of herein and each instance constitutes part of a continuing violation and operates to toll any applicable statute of limitation. Furthermore, Defendants are estopped from relying on any statute of limitations defense because of their unfair and deceptive conduct.

## CAUSES OF ACTION

### COUNT I – VIOLATIONS OF FLA. STAT. § 772.103 (FLORIDA RICO)
**(Stern, Kerkstra, and Chuhak)**

108.     Plaintiffs adopt and incorporate by reference each and every prior allegation in Paragraphs 1-107 above as and for this Paragraph 108 of Count I as though fully set forth herein.

109. As used in Count I, the term Defendants refers collectively to Defendants Stern, Kerkstra, and Chuhak.

## A. The Enterprise

110. An "enterprise" means any individual, sole proprietorship, partnership, corporation, business trust, or other legal entity, or group of individuals associated in fact although not a legal entity, and it includes illicit as well as licit enterprises and entities. Fla. Stat. § 772.102(3).

111. The Green Gas Arrangement is a RICO enterprise (the "Enterprise") as described in Fla. Stat. § 772.102(3) that was created by the Defendants and under the Defendants' common control. The Enterprise consists of: Gas Delaware Business Trust, Green Gas Delaware Statutory Trust, Bradshaw Gas General Partnership, Ciao Gas General Partnership, Perry Gas, GP, Buon Giorno Gas General Partnership, 2004 Gas General Partnership, Methane Blue LLC, Methane Green, LLC, and Red Gas LLC; Pontiac Statutory Trust; Methane Bio LLC; Allen Gas GP; Bradshaw Gas GP; Jaguar Gas GP; Buon Giorno Gas GP; Craig GP; Australia Gas GP; Casper Gas GP; Jones Gas GP; Zoeller Gas GP; Irwin Gas GP; JMK Gas GP; 2006 Methane Gas GP; DJRJ Gas GP; 2005 Medinah Gas GP; Winged Foot Gas GP; Bloomington GP; Methane Green LLC; Baltic Gas GP; Methane Blue LLC; Colt Gas GP; China Gas GP; Rocca Gas GP; DK Gas GP; BV Gas GP; Villapiano Gas GP; Pink Gas LLC; Werdna Gas GP; Red Gas LLC; Delaware Gas & Electric, Inc.; LaMonica Gas G.P.; Orange Gas; Davis Gas GP; Ciao Gas GP; Arrivederci Gas GP; and San Bernardino Gas GP; Banco PanAmericano Inc., Scattered Corporation; Rumpelstiltskin USA Corporation; Giddyup, Inc., ROLJFLP, Inc.; and Archimedes Financial, LLC .

112. The above entities were created and operated to facilitate the scheme of the Defendants, that is, by serving as the legal entity selling the FNS credits to the Plaintiffs and others.

The layers of ownership interest were meant to obscure the true origin (or lack thereof) of the tax credit along with trying to confuse and discourage any investigation into the tax credits origin.

113.    In fact, after the IRS began to investigate the tax returns, Defendants hoped that they could simply bury the IRS investigator in paper work in the hope the IRS would simply give up and not question the tax credits.

114.    All the Defendants used the Green Gas Arrangement as a RICO enterprise, and individually and through their agents, the Landfill Operators, represented to the Plaintiffs and other that the tax credits being sold through the Enterprise's entities qualified for such treatment under Section 29/45K, that the landfills were generating and had generated sufficient energy from landfill gas such that tax credits were available in excess of the amount to be paid by Plaintiffs, and that such tax credits were validly claimable on the tax returns of Plaintiffs.

115.    In reality, the Defendants knew that the tax credits being sold did not qualify under I.R.C. Section 29/45K and therefore could not support the promised tax benefits. The Green Gas Arrangement was devised solely as a vehicle to obfuscate the true nature the bogus tax credits and allow for sale to a large number of victims. This allowed Defendants to generate the largest amount of fees and commissions for themselves and advance their stature within the Chuhak firm and the broader legal community.  By satisfying the Landfill Operator's desire for the money, even though ill-gotten, the Defendants made millions of dollars.

116.    At all times relevant, the Enterprise was engaged in, and its activities affected, interstate and foreign commerce. The Enterprise had a structure and organization and existed apart from its predicate acts.  The Enterprise's components functioned together as a continuing unit, i.e., they were under the control of Defendants, and existed for a common purpose, i.e., for the economic benefit and gain of the Defendants who controlled the Enterprise, as further described

below.  The Enterprise had longevity sufficient to permit each legal entity constituting the Enterprise to pursue the Enterprise's purpose.  Each Defendant, including each legal entity Defendant, is distinct and separate from the enterprise of which they are a component part. As described further below, Defendants associated with the Enterprise, and conducted and participated, directly or indirectly, and/or conspired to conduct and participate, directly or indirectly, in the conduct of the affairs of the Enterprise through their involvement in the underlying criminal/racketeering activity as well as through the continuous concealment and promotion of the activities of the Enterprise, which constituted violations 18 U.S.C. § 1961 (by way of 18 U.S.C. §§ 1341 (federal mail fraud) and 1343 (federal wire fraud))  and Fla. Stat. § 517.301 (Florida securities fraud).

117.    The Defendants engaged in a common scheme, transaction, and course of conduct described herein in connection with the design operation, promotion and sale of the Green Gas Arrangement tax credits, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and a course of business that operated as a fraud upon the Plaintiffs.

118.    The purpose and effect of the Defendants' plan, transaction, and course of conduct was to generate huge fees by monetizing the Landfill Operators' bogus tax credits through the Green Gas Arrangement, and with regard to Stern, Shiner and Kerkstra, to advance their standing with the client and the Chuhak firm.

119.    Defendants maintain an interest in and control of the Enterprise and also conduct or participate in the conduct of the Enterprise's affairs through a pattern of racketeering activity.

120.    Defendants control and participation in the Enterprise was necessary for the successful operation of Defendants' scheme.

121.    The Enterprise, has a structure separate and apart from the pattern of racketeering activity in which the Defendants engaged.

**B.**    **Conducting the Affairs of the Enterprise**

122.    Section 29/45K caught the attention of unscrupulous accountants and others because tax credits under this section can reduce an individual's tax liability on a dollar-for-dollar basis.

123.    The appeal in selling the bogus tax credits is that their creation and validity can be easily masked, complete with voluminous paperwork and a specific tax code section referenced to create the illusion of validity. The Defendants and Landfill Operators knew the purchasers of the credits would not have access to the landfills and could easily hide the fact that the gas-to-energy equipment did not exist, or if it did, was not operational.

124.    By creating a web of entities (the Enterprise) and sham agreements, Defendants were able to obscure the true nature of the FNS credits and prevent even the most sophisticated consumer from identifying their true nature.

125.    The sole business of the Enterprise, established and controlled by the Defendants was to facilitate a fraudulent scheme of selling FNS credits.

126.    The Defendants were only concerned with selling as many fraudulent tax credits as possible, through the vehicle of the Enterprise, in order to maximize the profits for the Defendants, maintain one of the biggest clients of the Chuhak Firm, and advance their own standing within the Chuhak firm and the broader legal community.

127.    Furthermore, by controlling every aspect of the Enterprise's constituent parts and the information about the FNS credits, Defendants were able to give the appearance that the claimed FNS credits were legitimate.

128.     Each of the following participants played an important role in the conduct of the affairs of the Enterprise:

a.      Chuhak – the Chuhak firm, led by Defendant Stern and substantially assisted by Defendant Kerkstra, created, designed, and implemented the Green Gas Arrangement. Additionally, the Defendants produced bogus tax returns (with assistance from Defendant Shiner), Schedule K-1s, and other documents supporting the legitimacy of the FNS credits. The Defendants also furnished materials to the Landfill Operators to help in the sale and promotion of the Green Gas Arrangement and actually sold and promoted the Green Gas Arrangement themselves through misrepresenting that the tax credits being sold through the Enterprise's entities qualified for such treatment under Section 29/45K, that the landfills were generating and had generated sufficient energy from landfill gas such that tax credits were available in excess of the amount to be paid by Plaintiffs, and that such tax credits were validly claimable on the tax returns of Plaintiffs; and

b.      Landfill Operators – the Landfill Operators were instrumental in helping the Defendants create and implement the Green Gas Arrangement. Greenblatt, Nichols, Jahelka, Sharp, May, Horrell, Connelly and Werner were all board members and/or officers and owners of RTC where the FNS credits are alleged to have originated. Furthermore, they hired Stern and Chuhak to create the tax structures, which were used to funnel and obscure the true nature of the credits. Finally, they held themselves out as having knowledge and expertise in FNS tax credits. They used that alleged knowledge to help in the promotion and sale of the credits to Plaintiffs through misrepresenting that the tax credits being sold through the Enterprise's entities qualified for such treatment under Section 29/45K, that the landfills were generating and had generated sufficient energy from landfill gas such that tax credits were available in excess of the amount to be paid by Plaintiffs, and that such tax credits were validly claimable on the tax returns of Plaintiffs.

129.     The Defendants intended to commit mail, wire, and (Florida) securities fraud in connection with the promotion and operation of the Green Gas Arrangement because the Defendants knew that the FNS credits that were being sold were not legitimate and could not be claimed as a tax credit. They could not be claimed as a tax credit because the gas was in most instances not converted to electricity or was nonexistent.

130.     Unfortunately, the purchasers of the FNS credits from the Enterprise entities, including Plaintiffs, have been deemed by the IRS to have underreported their income for the years in which the FNS credits were claimed, and have been assessed penalties and interest for said

underpayment. Plaintiffs continue to incur thousands of dollars in additional accounting and legal fees in connection with the IRS investigation into their tax returns.

## C.   Pattern of Criminal / Racketeering Activity

131.    From in or about 2005, and continuing up through at least 2014, the aforementioned Defendants, each of whom are persons associated with, or employed by the Enterprise, did knowingly and unlawfully conduct or participate, directly or indirectly, in the affairs of the Enterprise through the following criminal/racketeering activities set out in Fla. Stat. § 772.102(1): 18 U.S.C. § 1961 (by way of 18 U.S.C. §§ 1341 (federal mail fraud) and 1343 (federal wire fraud)) and Fla. Stat. § 517.301 (Florida securities fraud).

132.    The Defendants engaged in the alleged criminal/racketeering activities with the intent to defraud Plaintiffs of their business and property. The Defendants also worked with others (including the Landfill Operators and Shiner) to defraud Plaintiffs of money or property by concealing material facts from Plaintiffs resulting in loss of Plaintiffs' property and monies. Plaintiffs allege that these activities constitute conduct committed by and through commission of mail fraud, and wire fraud, acts indictable as "criminal activity" as that term is defined in Fla. Stat. § 772.102(1).

133.    The course of conduct engaged in by the Defendants constituted at least two incidents of criminal/racketeering activity that had the same or similar intents, results, accomplices, methods of commission, or were interrelated by the distinguishing characteristics of the FNS tax credit scheme set out above which were not isolated incidents, thereby constituting a pattern of racketeering activity, as that term is defined in Fla. Stat. § 772.102(4)

134.    All predicate acts had the same purpose of utilizing the Enterprise to misrepresent the nature of the investments so that the Defendants could defraud those who purchased the

purported credits out of millions of dollars, maintain one of the largest clients of the Chuhak firm, and elevate their standing within the Chuhak firm and the broader legal community.  Plaintiffs allege that the continuity of the pattern of racketeering activity is "closed-ended" inasmuch as a series of related predicate offenses extended since at least year 2005 (a substantial period of time). Moreover, the continuity of the pattern of racketeering can be established under "open-ended continuity" as the predicate offenses are part of the Enterprise's regular way of doing business, and the predicates are attributed to Defendants' operating as part of a long-term association that existed for criminal purposes.

135.    Fla. Stat. § 772.102(1) provides that "criminal activity" means to commit, attempt to commit, or conspire to commit any of a long list of enumerated predicate offences, including any conduct defined as "racketeering activity" under 18 U.S.C. § 1961(1) and any crime chargeable by indictment or information under Fla. Stat. § 517.301 (Florida securities fraud).

136.    18 U.S.C. § 1961(1) provides that "racketeering activity" means any act indictable under any of the following provisions of Title 18, United States Code: § 1341 (relating to mail fraud) and § 1343 (relating to wire fraud).

137.    Mail and wire fraud together with Florida securities fraud were a regular way in which the Enterprise conducted business. The Defendants routinely used both the United States Postal Service (and other couriers) along with email, fax and the telephone to communicate, to exchange bogus documents, solicit business, file bogus tax returns, collect cash and otherwise perpetrate and further the scheme, including to Plaintiffs in the Southern District of Florida.

138.    For the purpose of executing, and/or attempting and/or conspiring to execute their transactions to defraud and to obtain money by means of false pretenses, representations or promises, the Defendants, in violation of 18 U.S.C. § 1341, placed in post offices and/or in

authorized repositories for mail matter and things to be sent or delivered by the United States Postal Service and received matter and things therefrom including but not limited to tax documents, contracts, instructions, correspondence, opinion letters, and others.

139.    For the purpose of executing and/or attempting to execute their transaction to defraud and to obtain money by means of false, pretenses, representations or promises, the Defendants, in violation of 18 U.S.C. § 1343, transmitted and received by wire matter and things therefrom including but not limited to tax documents, contracts, instructions, correspondence, opinion letters, funds, and others.

140.    In those matters and things sent or delivered by wire and through other interstate electronic media, Defendants falsely and fraudulently misrepresented and fraudulently suppressed material facts from Plaintiffs, in violation of 18 U.S.C. § 1343, as follows:

a.      In May of 2005, Defendants Stern and Kerkstra (in Chicago) knowingly spoke with Rappaport (in Georgia) on the telephone, in Rappaport's capacity as tax planner and representative of various and numerous professional athletes, including many (like Plaintiffs here), whom Rappaport stated were residents of Florida.  At that time, Defendants Stern and Kerkstra told Rappaport that the tax credits being sold through the entities set up by Defendants met all the requirements of Section 29/45K, that investments would result in ownership interests in entities that sold energy that qualified for FNS tax credits under Section 29/45K, that those tax credits were available in excess of the amount to be paid by Rappaport's clients for acquiring an interest in the energy-selling entity, and that such tax credits were validly claimable on the personal tax returns of Rappaport's clients. The Defendants withheld from Rappaport the fact that the landfills, which purportedly produced the credits, did not have in place the proper equipment to convert gas to energy. As a result of the foregoing false statements and omissions, the Defendants and Landfill Operators derived substantial profits and other benefits described in Paragraph 126.

b.      In June of 2005, Defendant Kerkstra (in Chicago) again spoke with Rappaport (in Georgia) in his capacity as tax planner and representative of various and numerous professional athletes, including many (like Plaintiffs here), whom Rappaport stated were residents of Florida.  At that time, Defendants Kerkstra again stated that validly claimable tax credits were for sale through the entities that had been set up by the Defendants. The Defendants withheld from Rappaport the fact that the landfills, which purportedly produced the credits, did not have in place the proper

equipment to convert gas to energy. As a result of the foregoing false statements and omissions, the Defendants and Landfill Operators derived substantial profits and other benefits described in Paragraph 126.

c.    In July of 2005, Defendants Stern and Kerkstra (in Chicago) again spoke with Rappaport (in Georgia) in his capacity as tax planner and representative of various and numerous professional athletes, including many (like Plaintiffs here), and specifically in relation to Plaintiff Kearse whom Rappaport stated was a resident of Florida. At that time, Defendants Kerkstra again stated that validly claimable tax credits were for sale to Plaintiff Kearse, and others, through the entities that had been set up by the Defendants. The Defendants withheld from Rappaport the fact that the landfills, which purportedly produced the credits, did not have in place the proper equipment to convert gas to energy. As a result of the foregoing false statements and omissions, the Defendants and Landfill Operators derived substantial profits and other benefits described in Paragraph 126.

d.    On or about August 9, 2005, Defendant Kerkstra (in Chicago) again spoke with Rappaport (in Georgia) in his capacity as tax planner and representative of various and numerous professional athletes, including many (like Plaintiffs here), whom Rappaport stated were residents of Florida. At that time, Karen Brenner was also on the telephone call. A second call occurred later that same day, without Brenner on the phone. In both conversations, Defendant Kerkstra again stated that validly claimable tax credits were for sale through the entities that had been set up by the Defendants. The Defendants withheld from Rappaport the fact that the landfills, which purportedly produced the credits, did not have in place the proper equipment to convert gas to energy. As a result of the foregoing false statements and omissions, the Defendants and Landfill Operators derived substantial profits and other benefits described in Paragraph 126.

e.    In late November or early December, Defendant Kerkstra (in Chicago) again spoke with Rappaport (in Florida) in his capacity as tax planner and representative of various and numerous professional athletes, including many (like Plaintiffs here), whom Rappaport stated were residents of Florida. At that time, Defendants Kerkstra again stated that validly claimable tax credits were for sale to Plaintiff Kearse, and others, through the entities that had been set up by the Defendants. The Defendants withheld from Rappaport the fact that the landfills, which purportedly produced the credits, did not have in place the proper equipment to convert gas to energy. As a result of the foregoing false statements and omissions, the Defendants and Landfill Operators derived substantial profits and other benefits described in Paragraph 126.

141.    The Defendants and Landfill Operators violated Fla. Stat. § 517.301 by selling the general partnership interests to the Plaintiffs  a) by using the Green Gas Arrangement as described

in this Complaint as the device and scheme to defraud Plaintiffs; b) to obtain money from Plaintiffs by making the false statements and failing to disclose material facts set forth in Paragraph 140 (a) through (e) and Paragraph 143.

142.    The predicate acts of mail, wire, and securities fraud began when Defendants made the above misrepresentations to Plaintiffs' representative.    Those misrepresentations were unwittingly and progressively conveyed to Plaintiffs by their representative in July of 2005 to Plaintiff Kearse, in August of 2005 to Plaintiff Coles, in September/October of 2005 to Plaintiff Sheppard, and November of 2005 to Plaintiff Starks. The Defendants' misrepresentations persisted, uncorrected, as Plaintiffs sent funds in exchange for ownership interests in Bradshaw Gas and Ciao Gas, and continued thereafter unabated. The Defendants and the other wrongdoers, on their own and through the Enterprise, which was used as a vehicle to defraud investors, thereby defrauded Plaintiffs.

143.    In those matters and things sent or delivered by the United States Postal Service, or transmitted via wire, Defendants falsely and fraudulently misrepresented and fraudulently suppressed material facts from Plaintiffs, in violation of 18 U.S.C. § 1341, 1343 and Fla. Stat. § 517.301, as follows:

| Date/Time Period | Document Type | Falsity | Action By |
|---|---|---|---|
| January 1, 2005 (stated) | Letter from Stern to L. Coles re: Investment into Bradshaw | Soliciting the sale of Section 45K tax credits/Advising to Invest; Attempt to Waive Conflict | Stern/Chuhak & Tecson |
| January 1, 2005 (stated) | Amended and Restated Partnership Agreement - Bradshaw (Coles) | Drafting and Transmittal of False Partnership Agreement | Stern/Chuhak & Tecson |
| January 1, 2005 (stated) | Promissory Note for $177, 197.41 (Coles) | Drafting and Allowing Transmittal of False Promissory Note | Stern/Chuhak & Tecson/Werner |

| April 11, 2006 | Letter from Stern to Coles Re: Schedule K-1 for Bradshaw and e-mail to Rappaport with the same information | Representing that FNS credits could legally be claimed | Stern/Kerkstra/ Chuhak & Tecson |
|---|---|---|---|
| January 1, 2005 (stated) | Letter from Stern to J. Kearse re: Investment into Bradshaw | Soliciting the sale of Section 45K tax credits/Advising to Invest; Attempt to Waive Conflict | Stern/Chuhak & Tecson |
| January 1, 2005 (stated) | Amended and Restated Partnership Agreement - Bradshaw (Kearse) | Drafting and Transmittal of False Partnership Agreement | Stern/Chuhak & Tecson |
| January 1, 2005 (stated) | Promissory Note for $196,464.32 (Kearse) | Drafting and Allowing Transmittal of False Promissory Note | Stern/Chuhak & Tecson/Werner |
| April 11, 2006 | Letter from Stern to Kearse Re: K-1 Schedule for Bradshaw and e-mail to Rappaport with the same information | Representing that FNS credits could legally be claimed | Stern/Kerkstra/ Chuhak & Tecson |
| July 1, 2005 (Stated) | Letter from Stern to Starks re: investment into Ciao Gas | Soliciting the sale of Section 45K tax credits/Advising to Invest; Attempt to Waive Conflict | Stern/Chuhak & Tecson |
| April 11, 2006 | Letter from Stern to Starks Re: K-1 Schedule for Ciao Gas and e-mail to Rappaport with the same information | Representing that FNS credits could legally be claimed | Stern/Kerkstra/ Chuhak & Tecson |
| July 1, 2005 (Stated) | Letter from Stern to Sheppard re: investment into Ciao Gas | Soliciting the sale of Section 45K tax credits/Advising to Invest; Attempt to Waive Conflict | Stern; Chuhak & Tecson |
| April 11, 2006 | Letter from Stern to Sheppard Re: K-1 Schedule for Ciao Gas and e-mail to Rappaport with the same information | Representing that FNS credits could legally be claimed | Stern/Kerkstra/ Chuhak & Tecson |

144.    At the times of the aforesaid representations, the Defendants knew that they were

materially false in that: (a) the majority of the landfills were/had been incapable of generating any

energy from landfill gas, much less energy in amounts sufficient to create FNS credits in excess

of the amounts being paid by Plaintiffs, (b) there was no plan to bring the majority of landfills into a state of being capable of generating energy from landfill gas, much less energy in amounts sufficient to create FNS credits in excess of the amounts being paid by Plaintiffs, nor had any such work been done, (c) those few that were capable of generating energy from landfill gas were not all operational during the entirety of 2005, and thus were/had been incapable of generating energy in amounts sufficient to create FNS credits in excess of the amounts being paid by Plaintiffs, and (e) almost no records were being/had been created and kept as would be required to establish the amount of energy actually generated as would be necessary for Plaintiffs to validly and appropriately claim FNS credits on their respective returns.

145.    The Defendants intentionally and knowingly made material misrepresentations and intentionally and knowingly suppressed material facts from Plaintiffs' representative, for the purpose of deceiving them and thereby obtaining financial and personal gain for themselves and their careers.  The Defendants either knew or recklessly disregarded that the misrepresentations and omissions described above were material. Plaintiffs were injured as a result of their justified reliance on the Defendants' misrepresentations and omissions in carrying out the transactions in Florida and subsequently filing tax returns from Florida using the tax credits reflected on the essentially-counterfeit K-1's issued by Defendants.

146.    As a direct and proximate result of their reliance, the Plaintiffs therefore have been injured in their business or property by Defendants' racketeering activities as described above and throughout this Second Amended Complaint.

147.    The Defendants and Landfill Operators associated with each other to form the Enterprise that sold fraudulent tax credits to the Plaintiffs.  The Defendants committed criminal and fraudulent acts when promoting and selling the illegal tax credits.

148.    The arrangement described herein was an ongoing organization with an ascertainable structure and purpose beyond the predicate acts and the conspiracy to commit such acts, by which the Defendants and the Landfill Operators functioned as a continuing unit.

149.    The Defendants and Landfill Operators engaged in a pattern of unlawful activity consisting of a scheme or artifice to defraud Plaintiffs.  The Defendants used their legal reputation to induce Rappaport knowing he would communicate with Plaintiffs to purchase the illegal FNS credits that had been misrepresented as valid credits by the Defendants and the Landfill Operators. The Defendants and the Landfill Operators engaged in a pattern of criminal activity to defraud Plaintiffs and others into participating in the Green Gas Arrangement for the sole purpose of enriching Defendants and the Landfill Operators. Defendant Stern has admitted to criminal conduct related to the Enterprise.  (Ex. 1).

150.    The Defendants and the Landfill Operators knew that the FNS credits sold to Plaintiffs were not valid but promoted, marketed and sold the FNS credits anyway in order to generate substantial fees.

151.    The Defendants engaged in this scheme or artifice to defraud over a period of no less than three (3) years that the FNS credits were sold.

152.    Plaintiffs would not have purchased the bogus FNS credits but for the Defendants' and the Landfill Operators' misconduct.  This act was related to the rest of their Tax Shelter Schemes in purpose, results, participants, methods of commission and similarity of victims. This behavior constitutes a pattern of unlawful activity over an extended period of time.

153.    Defendants' and Landfill Operators' conduct of the Enterprise and their pattern of illegal activity in connection with the promotion of the Tax Shelter Schemes commenced no later than in 2005 and continued through at least 2014. While Defendant Stern has been enjoined and

criminally convicted for his unlawful conduct, the Defendants still engage in the conduct of business and Landfill Operators still engage in the same fraudulent conduct that has embroiled them in litigation all over the country.

154.    Defendants' participation was integral to Plaintiffs and other claimants entering into the Green Gas Arrangement and claiming the FNS credits because it helped conceal the failures in the landfill operations to produce gas-to-energy and also conferred legitimacy upon the Green Gas Arrangement. Without the Defendants' participation, claimants would not have undertaken to purchase FNS credits. The Defendants were integral to the conduct of the Enterprise.

155.    Defendants' conduct as set forth herein was in concert with the Landfill Owners' conduct and planned and prearranged with and known by each of the other said participants in the Enterprise pursuant to the common scheme to sell bogus FNS credits.

156.    In violation of Fla. Stat. §772.103, Defendants and Landfill Owners conducted or participated in the conduct of the Enterprise's affairs through a pattern of criminal activity consisting of, inter alia, more than two acts of (i) federal racketeering activity consisting of mail fraud and wire fraud, (in violation of 18 U.S.C. §§ 1341,1343) and/or (ii) Florida securities fraud (in violation of and Fla. Stat. § 517.301).

157.    Plaintiffs are entitled to recover damages that reasonably flow from the Defendants' pattern of unlawful activity in promoting, facilitating and misrepresenting the business purpose and legality of the Enterprise and FNS Credits being sold, including but not limited to tax, penalties and interest attributable to the bogus FNS credits, attorneys and accountant's fees, and such other and further damages as reasonably flow therefrom, including but not limited to loss of use of the funds expended in return for the bogus FNS credits.

158.    Plaintiffs' damages were a reasonably foreseeable result of the Defendants' pattern of unlawful activity.

159.    Plaintiffs are entitled to compensatory and treble damages and attorneys' fees and costs.

WHEREFORE, for all of the foregoing reasons, Plaintiffs request this Honorable Court enter judgment in their favor and against Defendants Stern, Kerkstra, and Chuhak, for an amount in excess of $75,000, including professional fees and punitive damages, and for such other and further relief as this Court shall deem just and proper.

## COUNT II – BREACH OF FIDUCIARY DUTY
(All Defendants)

160.    Plaintiffs adopt and incorporate by reference each and every prior allegation in Paragraphs 1-159 above as and for this Paragraph 160 of Count II as though fully set forth herein.

161.    The Defendants represented and advised Plaintiffs regarding their purchase of the FNS credits.  As such, the Defendants owed a fiduciary duty to Plaintiffs.

162.    The Defendants breached their fiduciary duty to the Plaintiffs by:

a.      Failing to advise Plaintiffs of the true tax implications of their purchase;

b.      Failing to provide Plaintiffs complete and accurate information known to Defendants regarding the structure of Plaintiffs' purchase to give them the opportunity to make an informed decision as to whether they should purchase;

c.      Failing to advise Plaintiffs that purchasing the FNS credits would potentially subject Plaintiffs to taxes, penalties and unnecessary costs;

d.      Failing to advise Plaintiffs that FNS credits did not qualify as Section 29/45K status because of the manner in which they were created;

e.      Failing to disclose and explain to Plaintiffs the implications of Defendants' common representation of multiple clients; and

f.      Failing to advise Plaintiffs of their right to be independently represented.

g.  Failing to put the interests of the Plaintiffs ahead of their own interests when the Defendants failed to support the transactions when such transactions were challenged by the IRS, to avoid criminally implicating themselves, resulting in the imposition of additional tax, interest and penalties.

163.    As a direct and proximate result of one or more of the aforementioned breaches, the Plaintiffs have suffered damages including but not limited to loss of property, interest thereon, unnecessary tax liability, penalties and interest thereon, and unnecessary professional fees.

WHEREFORE, for all of the foregoing reasons, Plaintiffs request this Honorable Court enter judgment in their favor and against the Chuhak Defendants, for an amount in excess of $75,000, including professional fees and punitive damages, and for such other and further relief as this Court shall deem just and proper.

## COUNT III – AIDING AND ABETTING
### (Stern)

164.    Plaintiffs adopt and incorporate by reference each and every prior allegation in Paragraphs 1-163 above as and for this Paragraph 164 of Count III as though fully set forth herein.

165.    Subsequent to Plaintiffs' purchase of the fraudulent FNS credits from the Landfill Operators, Defendant Stern falsely represented to Plaintiffs that they had validly obtained FNS credits through the Green Gas Arrangement by issuing schedule K-1's that Defendant Stern and Kerkstra knew or should have known were false for the reasons set forth in paragraphs 140-144 above, and without telling Plaintiffs of those matters set forth in paragraphs 140-144 above. Plaintiffs did not learn of any of those matters until the year 2014, and those matters were not full adjudicated until August 14, 2018.

166.    The Defendants and the Landfill Operators knew that Plaintiffs' could not claim Section 29/45K tax credits due to the manner in which the Landfill Operators managed and

operated the Green Gas Arrangement, however, revealing same would have revealed the falsity of the representations set forth in paragraphs 140-144 above.

167.    The Defendants were intimately involved in the creation of the Green Gas Arrangement and worked closely with the Landfill Operators to market the FNS credits.

168.    As of April 11, 2006, the Defendants were aware that the Green Gas Arrangement was not operating in accordance with the requirements of Section 45K of the Tax Code.

169.    Despite this, Defendant Stern prepared schedule K-1 statements and mailed them to Plaintiffs on April 11, 2006, reporting FNS tax credits that the Defendants knew or should have known could not be claimed under Section 29/45K, being regularly aware of his role to legitimize the purported validity of the essentially counterfeit FNS credits he knew or should have known were bogus and to conceal that Plaintiffs had been defrauded

170.    Defendant Stern materially assisted the Landfill Operators' fraudulent monetization of FNS credits through issuing false schedule K-1 statements that he knew or should have known were false.

171.    Plaintiffs in fact relied on the Defendants by claiming those bogus tax credits instead of paying income tax in the amount of those purported credits, and as a direct and proximate result suffered damages including, but not limited to, the loss of property, unnecessary tax liability, and unnecessary professional fees.

WHEREFORE, for all of the foregoing reasons, Plaintiffs request this Honorable Court enter judgment in their favor and against Defendant Stern, for an amount in excess of $75,000, including professional fees and punitive damages, and for such other and further relief as this Court shall deem just and proper.

## COUNT IV – PROFESSIONAL NEGLIGENCE
### (All Defendants)

172.    Plaintiffs adopt and incorporate by reference each and every prior allegation in Paragraphs 1-171 above, with the exception of Paragraph as and for this Paragraph 172 of Count IV as though fully set forth herein.

173.    At all relevant times, Defendants represented the Plaintiffs and advised the Plaintiff, through Plaintiffs representative, to invest in the Green Gas Arrangement. Specifically, the Defendants advised that the Plaintiffs would receive Section 29/45K FNS credits.

174.    As such, Defendants owed a duty of care to act as reasonably careful attorneys.

175.    Defendants breached their duty in one or more of the following ways:

a.    Failed to advise of the true tax implications of their investment;

b.    Failing to provide complete and accurate information regarding the structure of the Green Gas Arrangement to allow the opportunity to make an informed decision on whether or not to invest in the Trust;

c.    Failing to advise that investing in the Green Gas Arrangement would subject Plaintiffs to tax, penalties, interest and unnecessary costs;

d.    Failing to advise that the Green Gas Arrangement did not qualify as an accepted structure under Section 29/45K; and

e.    Failing to advise that there is a right to be independently represented by another attorney in the transaction.

176.    As a direct and proximate result of the aforementioned breaches, the Plaintiffs suffered damages including, but not limited, the loss of investment, unnecessary tax liability, and unnecessary professional fees.

WHEREFORE, for all of the foregoing reasons, Plaintiffs request this Honorable Court to enter judgment in their favor and against the Defendants, for an amount in excess of $75,000,

including professional fees and punitive damages, and for such other and further relief as this Court shall deem just and proper.

## COUNT V – FRAUD
### (Defendants Stern, Kerkstra, and Chuhak)

177.    Plaintiffs adopt and incorporate by reference each and every prior allegation in Paragraphs 1-176 above as and for this Paragraph 177 of Count V as though fully set forth herein.

178.    As used in Count V, the term Defendants shall refer to Defendants Stern, Kerkstra, and Chuhak collectively.

179.    At all times relevant, the Defendants knew the Green Gas Arrangement was seriously flawed and would not qualify for FNS tax credits under Section 29/45K for the reasons stated in paragraphs 140-144 above.

180.    Despite this, Defendants advised Plaintiffs that the FNS credits being sold would qualify all individuals for tax credits under Section 29/45K as set forth in paragraphs 140-144 above.

181.    Defendants knew theses statement was false and that their representations that the purchase of the FNS credits would allow Plaintiffs to legally claim tax credits were also false.

182.    Defendants did not advise Plaintiffs that their purchase would not benefit them since Defendants and Landfill Operators knowingly failed to have gas-to-energy equipment in place and therefore did not meet the statutory requirements for the FNS credits and that little or no tax benefit would be realized.

183.    Defendants made the aforementioned statements and omissions about the FNS credits to induce Plaintiffs to purchase interest in the Tax Shelter Entities.

184.    Plaintiffs relied upon Defendants' false statements and omissions when they made the decision to purchase the FNS credits.

185.    Subsequent to the purchase, Defendants Stern issued schedule K-1 statements to Plaintiffs reporting FNS credits which he knew were not legally qualified under §29/45K.

186.    Plaintiffs relied on Defendant Stern's false statements in the K-1's by claiming tax credits and thereby reducing the federal income tax payment made for year 2005.

187.    Plaintiffs were injured by their reliance on Defendants' false statements.

188.    The aforementioned false statements caused Plaintiffs damage including, but not limited to, the loss of property, unnecessary tax liability, and unnecessary professional fees.

WHEREFORE, for all of the foregoing reasons, Plaintiffs request this Honorable Court enter judgment in their favor and against Defendants Stern, Kerkstra, and Chuhak, for an amount in excess of $75,000, including professional fees and punitive damages, and for such other and further relief as this Court shall deem just and proper.

## COUNT VI – CIVIL CONSPIRACY
### (Defendants Stern, Kerkstra, and Chuhak)

189.    Plaintiffs adopt and incorporate by reference each and every prior allegation in Paragraphs 1-188 above as and for this Paragraph 189 of Count VI as though fully set forth herein.

190.    As used in Count VI, the term Defendants shall refer to Defendants Stern, Kerkstra, and Chuhak collectively.

191.    By way of the Landfill Operators' close relationship with the Defendants, they were able to work in concert to sell bogus FNS credits.

192.    The Landfill Operators and the Defendants worked together to set up the Green Gas Arrangement; the Chuhak Defendants drafted many of the fraudulent documents at issue in this case.

193.    All Defendants then engaged in a nationwide solicitation effort to sell the bogus FNS credits that were being funneled through the Green Gas Arrangement.

194.   At all times, all Defendants knew that the FNS credits being sold were not in compliance with the applicable tax code sections and would not produce the intended benefit to the purchasers.

195.   The Chuhak Defendants and the Landfill Operators acted in furtherance of their agreement to sell bogus FNS credits by taking the following acts:

    a.    Designing, forming, and implementing the Green Gas Arrangement as an entity by which they could perpetrate their illegal tax scheme resulting in profit to the Defendants at the expense of Plaintiffs;

    b.    Representing that the Green Gas Arrangement was set up for a legitimate purpose;

    c.    Providing advice that the purchase of FNS credits from the Green Gas Arrangement would result in Plaintiffs being able to claim those credits on their respective tax returns;

    d.    Failing to disclose the illegal nature of their tax scheme;

    e.    Participating in the preparation and filing of the false and fraudulent income tax returns in connection with the Green Gas Arrangement and;

    f.    Submitting false and misleading information to the Internal Revenue Service in connection to its inquiries into the tax credits being claimed by the Plaintiffs.

196.   The above acts were in concert and in furtherance of the illegal scheme to sell bogus FNS credits.

197.   The conspiracy among the Defendants resulted in damage to the Plaintiffs including, but not limited to, the loss of property, unnecessary tax liability, and unnecessary professional fees.

WHEREFORE, for all the foregoing reasons, Plaintiffs request this Honorable Court enter judgment in their favor and against Defendants Stern, Kerkstra, Shiner and Chuhak, for an amount in excess of $75,000, including professional fees and punitive damages, and for such other and further relief as this Court shall deem just and proper.

## JURY DEMAND

Plaintiffs hereby demands a trial by jury in this action.

Respectfully submitted,

*Attorneys for Plaintiffs*
**SWEETAPPLE, BROEKER & VARKAS, P.L.**
44 W. Flagler Street, Suite 1500
Miami, Florida 33130
Tel.: (305) 374-5623
Fax: (305) 358-1023

By:       /s/ Kadisha D.  Phelps
Kadisha D. Phelps, Esq.
Florida Bar No: 033635
kadisha@broekerlaw.com
DOUGLAS C. BROEKER, ESQ.
Florida Bar No. 306738
doug@broekerlaw.com

and

**KONICEK & DILLON, P.C.**
***Counsel Admitted Pro Hac Vice***
70 W. Madison, Suite 2060
Chicago, IL 60602
Tel.: (312) 328-9166

By:      /s/ Amir R. Tahmassebi
AMIR R. TAHMASSEBI, ESQ.
Illinois Bar No. 6287787
amir@konicekdillonlaw.com
DANIEL F. KONICEK, ESQ.
Illinois Bar No. 6205408
jennifer@konicekdillonlaw.com
MICHAEL J. CORSI, ESQ.
Illinois Bar No. 6289269
mcorsi@konicekdillonlaw.com

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been filed with the Clerk by using CM/ECF system which will send a notice of electronic filing on the following counsel of record in this case on this 28th day of January, 2019 to: **David S. Hendrix, Esq**., david.hendrix@gray-robinson.com, Gray Robinson, P.A., 401 East Jackson Street, Suite 2700, Tampa, Florida 33602; **Michael J. Flaherty, Esq**., mflaherty@fylegal.com, ksesterhenn@fylegal.com, **Timothy P. Mahoney, Esq**., tmahoney@fylegal.com, John C. Koechley, Esq., jkoechley@fylegal.com, Flaherty & Youngerman, P.C., 20 S. Clark Street, Suite 1050, Chicago, Illinois 60603; **Ruel W. Smith, Esq**., rsmith@hinshawlaw.com, Hinshaw & Culbertson LLP, 100 South Ashley Drive, Suite 500, Tampa, Florida 33602; and **Terrence P. McAvoy, Esq**., tmcavoy@hinshawlaw.com, Hinshaw & Culbertson LLP, 151 North Franklin Street, Suite 2500, Chicago, Illinois 60606.

*I HEREBY CERTIFY that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-I (A).*

By:      /s/ Kadisha D.  Phelps
           Kadisha D. Phelps, Esq.
           Florida Bar No: 033635
           kadisha@broekerlaw.com